FILED
JUN 1 7 2016
Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v.  ) | Criminal Action No. 15-173 (RBW) |
| ) | |
| TARSEM SINGH, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

## MEMORANDUM OPINION

On December 17, 2015, the defendant in this criminal matter pleaded guilty to Conspiracy to Commit Major Fraud on the United States in violation of 18 U.S.C. §§ 371, 1031 (2012), see Information at 6, as a result of "execut[ing] a scheme to defraud the Small Business Administration [('SBA')] and the General Services Administration ('GSA')," Statement of Offense at 5. The defendant is now pending sentencing and the parties have submitted memoranda in aid of sentencing, drawing into question the sentencing range applicable to the defendant under the United States Sentencing Guidelines ("the Guidelines"). See Government's Memorandum in Aid of Sentencing ("Gov.'s Mem."); Defendant Tarsem Singh's Memorandum in Aid of Sentencing ("Def.'s Mem."). Specifically, the parties disagree as to the value of the loss sustained by the government resulting from the defendant's conduct, Gov.'s Mem. at 11; Def.'s Mem. at 9, as well as to the propriety of imposing a sentencing enhancement for the defendant's purported aggravated role as an organizer, leader, manager, or supervisor in the conspiracy to which he pleaded guilty, Gov.'s Mem. at 25; Def.'s Mem. at 22. Upon careful consideration of the parties' submissions, the Court concludes that the amount of loss that must be used in calculating the defendant's guidelines is the full amount of the contracts that the

defendant fraudulently procured, and that the Guideline enhancement for playing an aggravated role in the conspiracy is not applicable in this case.[1]

## I. BACKGROUND

The following factual allegations are drawn from the Statement of Offense submitted by the government, which the defendant agreed to, pursuant to Federal Rule of Criminal Procedure 11. Statement of Offense at 1.

The SBA operates what is referred to as the "8(a) program,"[2] which "is a development program that was created to help small, disadvantaged businesses compete in the American economy and access the federal procurement market." Id. at 1. Under the program, federal agencies award contracts to 8(a)-qualified firms "on either a set-aside basis, where the only competitive bidding is among similarly eligible firms, or on a sole-source basis, without competitive bidding." Id. at 1–2. To qualify for the program, a firm must be a small business and be at least fifty-one percent-owned and controlled by a United States citizen "of good character who meet[s] the SBA's definition of socially and economically disadvantaged." Id. at 1. Firms "must apply and qualify for participation in the 8(a) program through a formal SBA-administered application process" and "submit annual reviews" to demonstrate continued eligibility. Id. at 2. Firms may participate in the 8(a) program for up to nine nears, at which point they are considered by the SBA to have "graduated" and are "no longer eligible" for government contracts issued under the program. Id. Once a firm has graduated from the program, it may still "provide business development assistance to firms who are in the

---

[1] In addition to the documents previously referenced, the Court considered the following submissions: (1) the Presentence Investigation Report; (2) Defendant Tarsem Singh's Supplemental Memorandum in Aid of Sentencing ("Def.'s Supp."); and (3) Defendant Tarsem Singh's Notice of Supplemental Authority with Regard to Sentencing ("Def.'s Notice").

[2] "8(a)" refers to Section 8(a) of the Small Business Act. Statement of Offense at 1.

development stage of the 8(a) Business Development Program" through a related mentor-protégé program. Id. at 4.

From at least January 12, 2000, the defendant acted as the Vice President of "Company A"[3] which "specialize[d] in construction and renovating and altering buildings" from at least January 12, 2000 to December 2006. Id. at 4–5. Company A received its 8(a) certification on January 12, 2000, and "was lawfully awarded approximately $23 million in contracts from [the] GSA . . . ." Id. at 5–6. After nine years, Company A graduated from the 8(a) program on January 12, 2009. Id. at 5. On that same day, a second company—"Company B"—submitted an application for 8(a) certification. Id. at 6. "Company A loaned Company B the registration fee and referred Company B to a SBA Consultant to assist with the application." Id. In June 2009, Company B named the defendant as a Vice President of that company and "entered into a Mentor/Protégé Agreement" with Company A. Id.

Between July 2009 and March 2012, the government awarded Company B twenty-six federal contracts under the 8(a) program, totaling $8,533,562.86. Id. at 9. During this time, Company B had only one employee who actually performed work on any of the 8(a) contracts. Id. at 7. Instead, the

> [d]efendant engaged in and directed others to engage in the following practices:
>
> - Obtaining magnetic logos bearing the name of Company B[;]
>
> - Directing a Company A employee to place Company B's magnetic logos on a Company A vehicle when the vehicle would be used at construction sites for projects awarded by [the] GSA[;]
>
> - Using and directing other Company A employees to use Company B email accounts when corresponding with the government about contracts awarded to Company B. Emails sent from these Company B accounts transmitted across

---

[3] The parties have chosen to anonymize the names of the companies in public filings during these proceedings. See generally Statement of Offense.

3

    state lines with the communications terminating in the District [of Columbia][;]

- Instructing Company A employees to tell GSA representatives that they were representing Company B on certain jobs; and

- Providing to GSA representatives lists of employees for Company B that included individuals who were actually employed by Company A.

Id. at 7–8. Furthermore, the defendant "used a combination of Company A personnel and subcontractors to staff projects awarded to Company B on which Company A was working." Id. at 8. "On the contracts for which it made a profit, Company A's profits were, at least, $90,397.15," and the defendant's personal compensation attributable to those contracts was, at least, $28,768.28. Id. at 10.

## II. ANALYSIS

In assessing what sentence a defendant should receive, "[a] district court begins by calculating the appropriate Guidelines range, which it treats as 'the starting point and the initial benchmark' for [the] sentenc[e]." United States v. Akhigbe, 642 F.3d 1078, 1084 (D.C. Cir. 2011) (quoting Gall v. United States, 552 U.S. 38, 49 (2007)). When making the Guidelines calculation, the "commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it . . . is inconsistent with, or a plainly erroneous reading of, that guideline." Stinson v. United States, 508 U.S. 36, 38 (1993). "Then, after giving both parties an opportunity to argue for whatever sentence they deem appropriate," the court considers all of the sentencing factors listed in 18 U.S.C. § 3553(a) and undertakes "an individualized assessment based on the facts presented." Akhigbe, 642 F.3d at 1084 (citing Gall, 552 U.S. at 49–50).

### A. Total Loss Calculation

According to the Guidelines, the base offense level for the defendant's fraudulent conduct is six. See U.S.S.G. § 2B1.1(a)(2). This base offense level is then enhanced by a

graduated tier of increases based upon the amount of "loss" involved in the fraud, see U.S.S.G. § 2B1.1(b), with the commentary defining actual loss as "the reasonably foreseeable pecuniary harm that resulted from the offense," id., cmt. n.3(A)(i). For purposes of identifying the correct adjustment, the amount of the loss is typically reduced by "the services rendered[] by the defendant or other persons acting jointly with the defendant[] to the victim before the offense was detected." Id., cmt. n.3(E)(i). Notwithstanding this adjustment, the commentary prescribes "Special Rules" for determining the amount of the loss, one requiring that "[i]n a case involving government benefits . . . loss shall be considered to be not less than the value of the benefits obtained by unintended recipients or diverted to unintended uses . . . ." Id., cmt. n.3(F)(ii). The government argues that the "loss [in this case] is the full value of the contracts obligated in connection with the scheme, which the parties have agreed is $8,533,562.86," "result[ing] in an [eighteen]-level adjustment." Gov.'s Mem. at 11; see also U.S.S.G. § 2B1.1(b)(1)(J). In contrast, the defendant contends that he "provided valuable services to the government, gaining only $28,768.28 [in profit] from the relevant contracts," Def.'s Mem. at 8, resulting in only a four-level adjustment, U.S.S.G. § 2B1.1(b)(1)(C).

This Circuit has not considered whether the Special Rule pertaining to government benefits applies to set-aside procurement programs administered by the SBA, but decisions from three circuits support this conclusion. See United States v. Blanchet, 518 Fed. App'x 932, 956–57 (11th Cir. 2013); United States v. Leahy, 464 F.3d 773, 790 (7th Cir. 2006); United States v. Bros. Constr. Co., 219 F.3d 300, 317–318 (4th Cir. 2000). In Blanchet, two criminal defendants were convicted of fraudulently procuring a "$100 million, small business set-aside contract with the federal government" after it was revealed that their "company did not meet the necessary federal standards to be considered a small business." 518 Fed. App'x at 934. Citing the Special

Rule regarding government benefits, the Eleventh Circuit concluded that "the amount of loss in cases involving government benefits programs equals the entire amount of the contract at issue" and therefore it was appropriate to attribute "the entire amount of the contract issue—$100 million—to the [d]efendants as loss." Id. at 957. That Circuit reasoned that:

> the small business set-aside contract at issue . . . was set aside to provide exclusive opportunities to small businesses . . . . Despite the [d]efendants' argument that the government benefitted from the contract rather than losing from it, Congress has emphasized that there is a concern in ensuring that small businesses have a fair proportion of federal contracts because of the benefit that the nation receives from having a strong class of small businesses. By defrauding the government to obtain the contract, the [d]efendants prevented the government from awarding the contract to a legitimate small business, and therefore, deprived other small businesses of the ability to obtain this contract.

Id. at 956–57 (citations omitted).

The Seventh Circuit addressed the same question in Leahy, albeit with respect to state-administered programs with "funds slotted for minority- and women-owned businesses." 464 F.3d at 778. Citing the Special Rule regarding government benefits, that Circuit explained:

> This was an affirmative action program aimed at giving exclusive opportunities to certain women and minority businesses. The contracts which these businesses received pursuant to this type of program constitute government benefits.

Id. at 790. The Seventh Circuit concluded that the district court erred when "it used the contract loss formula of 'contract price minus the benefit provided'" and that it should have "comput[ed] the total 'value of the benefits diverted from intended recipients or uses' in its analysis." Id. And relying upon similar logic, the Fourth Circuit arrived at the same conclusion in Brothers Construction. 219 F.3d at 317–18 ("[The defendants] conspired in a scheme that was intended to divert this money to . . . a non-[disadvantaged business enterprise]. If not for the audit that revealed [the defendants'] failure to participate, the [disadvantaged business enterprise] funds would not have eventually reached a [disadvantaged business enterprise]. These facts

demonstrate a loss under . . . the guidelines because the conspiracy would have diverted the funds entirely from any [disadvantaged business enterprise] but for the audit.").

This reading of the Guidelines by the Fourth, Seventh, and Eleventh Circuits comports with the unambiguous intentions of Congress as articulated in the Small Business Jobs Act of 2010, Pub. L. No. 111-240, 124 Stat. 2504 (2010). As part of that legislation, Congress codified the following presumption:

> In every contract . . . which is set aside, reserved, or otherwise classified as intended for award to small business concerns, there shall be a presumption of loss to the United States based on the total amount expended on the contract . . . whenever it is established that a business concern other than a small business concern willfully sought and received the award by misrepresentation.

15 U.S.C. § 632(w)(1) (2012). The regulation implementing this provision is instructive, as it reiterates that "there shall be a presumption of loss to the United States based on the total amount expended on the contract," 13 C.F.R. § 121.108(a) (2016), and explains that "[p]ersons or concerns are subject to severe <u>criminal</u> penalties for knowingly misrepresenting the small business size status of a concern in connection with procurement programs . . . ," <u>id.</u> § 121.108(e)(3) (emphasis added) (also noting that penalties for misrepresentation may include civil penalties and suspension or debarment from future procurements). And when publishing the final rule in the Federal Register, the SBA again explained that "the presumption of loss provisions will be utilized in civil <u>and criminal</u> Federal court proceedings." Small Business Size and Status Integrity, 78 Fed. Reg. 38811, 38812 (June 28, 2013) (emphasis added); <u>accord id.</u> at 38816 ("[I]t is SBA's intent that the presumption of loss shall be applied in all manner of <u>criminal</u>, civil, administrative, contractual, common law, or other actions, which the United States government may take to redress willful misrepresentation." (emphasis added)); <u>see also</u> <u>Envtl. Def. Fund, Inc. v. Blum</u>, 458 F. Supp. 650, 658 (D.D.C. 1978) (relying on an agency's

preamble to a regulation published in the Federal Register to "buttress[]" its interpretation of that regulation).

The Court recognizes that the statute and regulation both indicate that there is only a "presumption" that the loss should amount to the total contract value. 15 U.S.C. § 632(w)(1) (2012); 13 C.F.R. § 121.108(a) (2016). The defendant contends that this presumption in the statue and regulation may be rebutted by evidence that the defendant "provided valuable services to the government." Def.'s Mem. at 13. However, there is simply no legal authority—and the defendant cites none in his sentencing memorandum—which supports the proposition that this statutory presumption may be rebutted by such evidence. Contrary to the defendant's assertions, the SBA's regulation clarifies the matter—the presumption of loss "may be determined not to apply in the case of unintentional errors, technical malfunctions, and other similar situations that demonstrate that a misrepresentation of size was not affirmative, intentional, willful[,] or actionable under the False Claims Act . . . ." 13 C.F.R. § 121.108(d) (2016). Indeed, when publishing the final rule in the Federal Register, the SBA noted that it had originally proposed language that would have made the presumption "irrefutable," but determined that this would be inappropriate in light of due process requirements because the "SBA's regulations limit liability in the case of unintentional error, technical malfunction, or other similar situations," and "an 'irrefutable' presumption would be inappropriate in these instances." Small Business Size and Status Integrity, 78 Fed. Reg. 38811, 38812 (June 28, 2013). The Court construes this explanation to indicate that the <u>only</u> permissible means by which the presumption of loss may be rebutted would be through the introduction of evidence establishing that one of those circumstances enumerated in 13 C.F.R. § 121.108(d) is applicable to the case. C.f. <u>Christensen v. Harris Cty.</u>, 529 U.S. 576, 583 (2000) ("We accept the proposition that 'when a statute limits a

thing to be done in a particular mode, it includes a negative of any other mode.'" (quoting Raleigh & Gaston R. Co. v. Reid, 13 Wall. 269, 270 (1872)) (brackets omitted)); Pauley v. BethEnergy Mines, Inc., 501 U.S. 680, 703 (1991) (noting that "the delineation of two methods of rebuttal may support an inference that the drafter intended to exclude rebuttal methods not so specified," but affording judicial deference to an agency's reasonable interpretation that additional methods of rebuttal were specified in the controlling authority). Therefore, other forms of evidence, such as evidence suggesting that the defendant performed according to the government contract, does not provide a basis for rebutting this presumption.

The defendant cites decisions from three Circuits that suggest that the Special Rule pertaining to government benefits does not apply to his conduct, none of which are persuasive. In United States v. Martin, the Ninth Circuit considered the appropriate Guidelines range for a criminal defendant convicted of "fraudulently obtain[ing] government contracts" through SBA programs and "a state-administered Disadvantaged Business Enterprise [] program." 796 F.3d 1101, 1103–04 (9th Cir. 2015). The Ninth Circuit found the government benefits Special Rule inapplicable because "[t]he examples given—loans, grants, and entitlement program payments—confirm that this comment deals with unilateral government assistance, such as food stamps, not a fee-for-service business deal." Id. at 1109. The Ninth Circuit also explained that "if there is any lingering ambiguity as to whether [the] program is a 'government benefit,' then the application note cannot apply" based upon the rule of lenity. Id. Therefore, the Ninth Circuit instructed the district court on remand to consider the defendant's performance under the contract as a credit against pecuniary loss under the Guidelines. See id. at 1110.

The Court respectfully disagrees with the Ninth Circuit's analysis in Martin. With respect to that Circuit's interpretation of the scope of the term "government benefits" based upon

the examples provided, it is certainly true that "[t]he plainness or ambiguity of statutory language is determined [not only] by reference to the language itself, [but as well by] the specific context in which that language is used, and the broader context of the statute as a whole," Robinson v. Shell Oil Co., 519 U.S. 337, 341 (1997). But this particular canon of statutory interpretation is applicable only where the term at issue is, in fact, ambiguous. See, e.g., BedRoc Ltd., LLC v. United States, 541 U.S. 176, 183 (2004) ("The preeminent canon of statutory interpretation requires us to presume that [the] legislature says in a statute what it means and means in a statute what it says there. Thus, our inquiry begins with the statutory text, and ends there as well if the text is unambiguous." (emphasis added) (citations omitted)). Here, the Ninth Circuit did not even consider 15 U.S.C. § 632(w)(1), and the unambiguous language of this statutory provision makes clear that there is a presumption that the amount of the loss in circumstances such as these is "based on the total amount expended on the contract." The Ninth Circuit's interpretation is simply inconsistent with this language. And this language compels this Court to reject Martin's reasoning because "the Sentencing Commission does not have the authority to override or amend a statute." United States v. Novey, 78 F.3d 1483, 1486 (10th Cir. 1996) (citing Neal v. United States, 516 U.S. 284, 290 (1996)); see also Stinson, 508 U.S. at 37–38 ("[C]ommentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." (emphasis added)). Thus, to the extent that there are any discrepancies between the Guidelines and Congressional legislation—as would be the case if the Court were to follow Martin's analysis—it is the legislation that must ultimately prevail.

Martin's reliance on the rule of lenity in the alternative is similarly flawed. The rule of lenity applies only if, "after seizing everything from which aid can be derived," Smith v. United

States, 508 U.S. 223, 239 (1993), a court can make "no more than a guess as to what Congress intended," Ladner v. United States, 358 U.S. 169, 178 (1958). But here, based upon the clear language set forth in 15 U.S.C. § 632(w)(1), no such ambiguity remains. And as the Court has already noted, the Ninth Circuit did not consider or reference this legislation in its analysis, see generally Martin, 796 F.3d at 1101–12, and thus, the Court does not find that Circuit's rule of lenity application persuasive.

The Fifth Circuit followed Martin's rationale in United States v. Harris, __ F.3d __, __, 2016 WL 1720046 (5th Cir. 2016), concluding that "procurement frauds involving contracts awarded under the 8(a) set-aside program, like procurement frauds generally, should be treated under the general rule for loss calculation, not the government benefits rule," id. at *14. In Harris, the Fifth Circuit explained:

> While a government contract awarded under an affirmative action program may be, in some sense, a "benefit" to the company awarded the contract, it does not share the common features of grants, loans, and entitlement program payments. Unlike the three enumerated examples, a contract award is not a unilateral transfer, but rather a bargained-for exchange for services rendered. And unlike the enumerated examples, contracts awarded under the 8(a) program do not exist primarily to benefit the awardee; rather, such contracts first and foremost serve the government's own procurement needs.

Id. at *13 (citation omitted). But as in Martin, the Fifth Circuit did not consider the impact of 15 U.S.C. § 632(w)(1), and Harris is therefore just as unpersuasive as the Ninth Circuit's analysis in Martin.

Lastly, the defendant relies upon the Third Circuit's decision in United States v. Nagle, 803 F.3d 167 (3d Cir. 2015). In Nagle, the Third Circuit reviewed the sentence given to criminal defendants convicted of fraudulently procuring contracts under a Pennsylvania-administered program that awarded contracts on a preferential basis to "disadvantaged business enterprises." Id. at 171–72. In calculating the amount of loss associated with the fraud, the Third Circuit

11

concluded that it "need not decide whether the [disadvantaged business enterprise] program is a 'government benefit'" because Note 3(E)(i) of the Guidelines would apply to the loss calculation regardless and thus a court "must subtract the 'fair market value' of the 'services rendered' by [the defendants' companies] on the contracts before arriving at a final loss value." Id. at 180, 182. But this finding does not influence the Court's decision because the state-administered procurements at issue in Nagle were neither administered by the SBA nor subject to 15 U.S.C. § 632(w)(1). Therefore, the Third Circuit had no reason to consider the impact of that legislation.

In sum, the Court is persuaded by the reasoning adopted by the circuits that have interpreted the Guidelines' use of the term "loss" in the defendant's circumstances as the total amount of the contract at issue. Interpreting the Guidelines otherwise would be inconsistent with the aforementioned provisions of the Small Business Jobs Act of 2010. Therefore, the Court will treat the loss in this case to be $8,533,562.86, see Statement of Offense at 9, which requires an adjustment of eighteen levels under the Guidelines, see U.S.S.G. § 2B1.1(b)(1)(J).[4]

### B. The Aggravated Role Enhancement

The parties also disagree as to whether the defendant should receive an increase of his offense level for playing an aggravated role in the offense. Gov.'s Mem. at 25; Def.'s Mem. at

---

[4] While the amount of the loss used in calculating the appropriate Sentencing Guidelines range will not be reduced based upon the work performed by the defendant's company on the contracts at issue in this case, nothing precludes the defendant from requesting a downward departure in light of the circumstances presented here. Indeed, as the government notes in its sentencing memorandum, "it is a goal of the Guidelines to avoid unwarranted sentencing disparities," Gov.'s Mem. at 30 (citing U.S.S.G. § 1.A1.1(3)), and "even in circuits . . . that base loss on the full value of the contracts, it appears that sentencing courts routinely sentenced below the applicable Guidelines range—and often significantly below the range," id. at 31 (citing Blanchet, 518 Fed. Appx. at 955; Nagle, 2014 WL 4672448) (other citations omitted). And "when one examines the sentences actually imposed, it appears that regardless of whether loss for purposes of the Guidelines calculation is based on the full value of the contracts or some other metric, the sentences ultimately imposed seem to be more consistent with loss being based on the profit that the defendants generated from the schemes." Id. at 32. While the Court will not determine the actual sentence it will impose until the sentencing hearing, it emphasizes that the resolution of this Guidelines issue in favor of the government may not ultimately influence the length of the defendant's sentence if the Court concludes that a significant downward departure is appropriate.

22. According to the Guidelines, a defendant's offense level is increased by two levels "[i]f the defendant was an organizer, leader, manager, or supervisor in any criminal activity" that involved less than five participants and was not "otherwise extensive." U.S.S.G. § 3B1.1(c). When evaluating the propriety of applying this enhancement to a defendant's Guidelines range, the Court must consider the following factors:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

Id., cmt. n.4; see also United States v. Graham, 162 F.3d 1180, 1185 n.5 (D.C. Cir. 1998) (factors are relevant to whether any aggravated role enhancement applies). No single factor is dispositive. Graham, 162 F.3d at 1185. "At sentencing, it is the Government's burden to demonstrate by a fair preponderance of the evidence that [the] enhancement is warranted." United States v. Bapack, 129 F.3d 1320, 1324 (D.C. Cir. 1997) (discussing U.S.S.G. § 3B1.1(c)).

The aforementioned factors aside, this Circuit has emphasized that there is a threshold requirement such that "[t]he defendant must manage or supervise one or more other participants in the criminal activity—not simply the property or assets of the conspiracy . . . —in order to warrant an aggravated role enhancement." United States v. Olejiya, 754 F.3d 986, 990 (D.C. Cir. 2014) (citing U.S.S.G. § 3B1.1, cmt. n.2); see also U.S.S.G. § 3B1.1, cmt. n.2 ("To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants."). And as defined in the commentary to this Guideline, "[a] 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1, cmt. n.1 (emphasis added). Thus, for the enhancement to apply, there must be "proof that [the defendant] was hierarchically superior to [his] co-conspirators." United States v. Quigley, 373 F.3d 133, 140 (D.C. Cir. 2004)

13

(emphasis added); see also United States v. Clark, 747 F.3d 890, 896–97 (D.C. Cir. 2014) ("[W]e are convinced by the district court's discussion of [the defendant]'s cousin's criminal involvement that the court found that [the defendant] controlled at least one criminal participant.").

While the defendant here clearly exercised managerial authority in the administration of the companies that fraudulently secured contracts under the 8(a) program, nothing in the record before the Court suggests that he exercised control over any co-conspirator subject to criminal liability. For example, the Presentence Investigation Report reasons that the adjustment is warranted because:

> The defendant exercised management responsibility over the contracts for [Company B], had signatory authority over [Company B]'s bank account, recruited employees from [Company A] to perform contract work for [Company B], and directed those employees to represent that they were employees of [Company B], when they were actually employed by [Company A].

Presentence Investigation Report at 10. Similarly, the government contends that the adjustment is warranted because:

> 1) [the] [d]efendant was a vice-president of Company B . . . ; 2) [the] [d]efendant took several actions, and directed others to take actions, that disguised the [d]efendant's and others' true affiliation as Company A employees, including creating Company B email accounts and obtaining and using Company B magnetic logos for use on a Company A vehicle; 3) the [d]efendant obtained signature authority over Company B's bank account; and 4) the [d]efendant made significant business decisions for Company B, including deciding whether to bid on contracts, preparing bids or directing someone else to do so, and deciding how to staff contracts received.

Gov.'s Mem. at 26–27 (citations omitted). Furthermore, the government notes that "the [d]efendant regularly signed documents in his role as vice-president of Company B," "signed checks for Company B," "prepared bids and proposals on Company B letterhead," and "emailed [the] GSA regarding individuals who would work on projects on certain occasions, directed

Person A to do so on other occasions, and made decisions such as to whether employees would work or not." Id. at 27.

Nowhere in the Statement of the Offense, the Presentence Investigation Report, or the Government's Memorandum in Aid of Sentencing is it suggested that another person is criminally liable for the conduct at issue in this case over whom the defendant exercised any control. While it is true that subordinate employees of Companies A and B may have assisted in the perpetration of the fraudulent bidding process and otherwise performed on the contracts awarded to the defendant's company, nothing in the record demonstrates that these employees were anything other than unwitting accomplices. And "supervision of an unwitting individual cannot justify an enhancement under U.S.S.G. § 3B1.1(c)." United States v. McCoy, 242 F.3d 399, 410 (D.C. Cir. 2001). As the government has not demonstrated that the defendant "manage[d] or supervise[d] one or more other participants in the criminal activity," the aggravated role enhancement is not appropriate in this case. See, e.g., Olejiya, 754 F.3d at 990 (citation omitted).[5]

### III. CONCLUSION

For the foregoing reasons, this Court finds that the amount of the loss to the Government under the fraudulently procured contracts is based on the full value of the contracts awarded. The Court also concludes that application of the two-level aggravated role enhancement set forth in Guideline 3B1.1(c) is not appropriate in this case.[6]

---

[5] Of course, the defendant's managerial capacity at these companies may still be considered during the sentencing process. As the commentary to the Guidelines indicates, "[a]n upward departure may be warranted . . . in the case of a defendant who did not organize, lead, manage, or supervise another participant, but who nevertheless exercised management responsibility over the property, assets, or activities of a criminal organization." U.S.S.G. § 3B1.1, cmt. n.2.

[6] The Court will contemporaneously issue an order consistent with this Memorandum Opinion.

**SO ORDERED** this 17th day of June, 2016.

                                                      REGGIE B. WALTON
                                                     United States District Judge